CLEARCHIE LAWRENCE,                    )
                                       )
              Plaintiff,               )    Case. No. 11 C 0205
         v.                            )
                                       )    Magistrate Judge
Michael J. Astrue,                     )    Arlander Keys
Commissioner of Social                 )
Security                               )
              Defendant.               )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Clearchie Lawrence ("Mr. Lawrence" or "Plaintiff"), seeks judicial review of the partially favorable decision of the Commissioner of Social Security ("Commissioner") finding him disabled, yet not on the date that he alleges the onset of his disability. This case is before the Court on cross-motions for summary judgment: Mr. Lawrence requests that the Court reverse the unfavorable part of the commissioner's decision, and the Commissioner requests that the Court affirm the partial decision to deny benefits.

Mr. Lawrence raises several issues for review, including: 1) whether the ALJ erred by finding that he could return to his past relevant work as a road supervisor because her appraisement to do past relevant work lacks a "critical view" of the evidence as required by *Lopez* and *Steele*; (2) whether the ALJ erred in stating that Mr. Lawrence could continue to do light work, and

ignored that his past relevant work as actually performed was medium work; (3) whether the ALJ failed to properly consider the requirements of SSR 02-1P in not considering the impact of his obesity on his ability to do work; (4) whether the ALJ wrongly interpreted the classification of class II heart failure on the effects of Mr. Lawrence's residual functional capacity; (5) whether the ALJ failed to consider the combination of his impairments on his ability to do even light work; (6) whether the ALJ failed to state all of the elements that affect Mr. Lawrence's Residual Functional Capacity as required by *Prochaska*; and (7) whether the ALJ failed to give Mr. Lawrence a fair and full hearing by consulting with the Medical Expert prior to the hearing. For the reasons set forth below, Plaintiff's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.

## **FACTUAL BACKGROUND**

PRE-DECISION PROCEDURAL HISTORY

On April 2, 2008 Mr. Lawrence filed an application for Social Security Disability Insurance Benefits, claiming disability for a variety of health problems on January 2, 2008. His request was denied on June 26, 2008, and his request to reconsider was denied on September 11, 2008. Administrative Law

Judge ("ALJ") Mona Ahmed held a hearing in Orland Park, Illinois on August 26, 2009. Present at the hearing were Mr. Lawrence, Dr. Hugh Savage, a Medical Expert, and Ms. Pamela Tucker, a Vocational Expert. On January 21, 2010 the ALJ issued a partially favorable opinion, finding Mr. Lawrence disabled on account of his recurrent prostate cancer diagnosis. However, she did not find Mr. Lawrence disabled on January 2nd as alleged, but rather nine months later in September. Mr. Lawrence filed a Request for Review of the Hearing Decision on March 12, 2010, which was denied on December 6, 2010.

The ALJ determined disability started on September 9, 2008, the date on which Mr. Lawrence received a recurrent prostate cancer diagnosis. The ALJ did not find him disabled during the eight-month period from January 1 through September 8, 2008 because he could perform his past relevant work and did not have a qualifying disability. Mr. Lawrence appeals for disability benefits covering this eight-month window, alleging that the ALJ erred in her decision.

<u>POST-DECISION PROCEDURAL HISTORY:</u>

Mr. Lawrence sought review of the ALJ's decision with the Appeals Council on March 3, 2010, R. at 26, and this appeal was denied on December 6, 2010, making the ALJ's decision the final decision of the Commissioner. R. at 1-3. On January 12, 2011,

Mr. Lawrence filed a Lawsuit in the United States District Court for the Northern District of Illinois seeking review of that decision.  The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on January 12, 2011.  The parties then filed cross-motions for summary judgment.

<u>HEARING TESTIMONY</u>

I.  Claimant's Hearing Testimony

Mr. Lawrence testified that he was 61 years old at the time of his hearing.  R. at 36.  He was 6' tall and weighed 285 pounds.  R. at 182. He testified that he was married, had four children, and twelve grandchildren; his minor child, an eight year old daughter, resided at home with him and his wife in their two-story home.  R. at 36-37.  He testified that he typically drove each day to take his daughter to school, but other than that, did not travel much, although he occasionally visited his brother about 35 minutes away by car.  R. at 37-38.

Mr. Lawrence last worked on December 31, 2007.  R. at 39. He quit his job with the Chicago Transit Authority (CTA) after 30 years of employment with the CTA, and 20 years in his last role as a Bus Service Supervisor.  R. at 154.  Mr. Lawrence worked for the CTA as a supervisor for individuals who did not want to do

their job; this job was very stressful, according to Mr. Lawrence's testimony, because he had to resolve customer and employee complaints. R. at 40. He testified that he checked into the office each day, but most of his job was "in the field" not done sitting at a desk. R. at 65.

Mr. Lawrence was last insured on December 31, 2012. He testified that he retired from the CTA but planned on getting another job. R. at 39. However, he was physically unable to work another job because of the pain in his knees and in his legs. R. at 39. He also testified that he had heart problems and high blood pressure, including a bypass in 2003 that kept him out of work for three months. R. at 40. Mr. Lawrence testified that no doctor recommended that he quit working. R. at 41.

Mr. Lawrence complained that he could no longer sit down to do his job because when he sits for too long he gets tired and is short of breath 2 to 3 times a day. R. at 41. He testified that the shortness of breath lasts a minute or two and alleviates if he moves around and changes positions. R. at 41-42. The shortness of breath started after Mr. Lawrence quit working. R. at 43. Although he had high blood pressure, he was asymptomatic and did not mention the shortness of breath to his doctor until March of 2009. R. at 43-44.

He also complained of knee pain, saying his knee gives out

sometimes and that the cold makes the condition worse, probably because of his arthritis. R. at 42, 43. He also testified that he suffered gout episodes every 2-3 months in his big toe and complained that the pain was so intense that he could not walk. R. at 42. He testified that he treated these conditions by taking Tylenol, laying down, and sleeping. R. at 42. His gout was not medicated by a doctor. R. at 43. Mr. Lawrence explained that he elevates his legs throughout the day or otherwise they swell. He testified that he wore compression stockings, and that while his legs swell after 20-30 minutes of sitting, walking around alleviated the problem. R. at 54, 58. Mr. Lawrence testified that his doctor instructed him to elevate his legs as such. R. at 55. Mr. Lawrence also complained that he was tired throughout the day because of his sleep apnea, and testified that he sleeps with a CPAP every night, but still dozes off at work. R. at 54.

II. Medical Expert's Testimony

The ALJ admitted speaking with the Medical expert Hugh Savage, MD, twice before the start of the hearing in regards to Mr. Lawrence's prostate cancer treatment. R. at 32, 45. Dr. Savage started the hearing summarizing that there was a recurrence of prostate cancer, but not after hormone treatment. R. at 33. Rather, Mr. Lawrence had surgery as his initial

treatment. R. at 33. Dr. Savage testified that an initial treatment of hormone therapy indicates that one is too fragile for an operation and is indicative of a more serious case. R. at 33. Mr. Lawrence did not have hormonal intervention and did not show visceral metastis to other visceral organs after his operation. R. at 32-35. Dr. Savage noted that Mr. Lawrence had hypertension, a history of congestive heart failure, coronary artery disease, obesity, and degenerative joint disease based on the record. R. at 45-46. Gout was noted in the record but was not being tracked by physicians. R. at 46.

Save for tenderness in Mr. Lawrence's knees and left shoulder, x-rays were normal and Dr. Savage observed nothing else out of the ordinary in Mr. Lawrence's records. R. at 46. Dr. Savage did note that obesity might increase Mr. Lawrence's fatigue, and did not think that Mr. Lawrence was limited in terms of standing, in spite of his obesity. R. at 48. Dr. Savage found the claimant's ejection fraction normal, his blood pressure well-controlled, and his stress testing normal. R. at 49. Dr. Savage thus did not find Lawrence's cardiac condition limiting. Because his sleep apnea was being treated, Dr. Savage found no reason for Mr. Lawrence needing to nap throughout the day. R. at 56. He also noted that, although there was some venous insufficiency, no significant swelling appeared in Mr. Lawrence's

record, and while obesity combined with venous insufficiency would make it more likely for Mr. Lawrence to have edema, he found no medical need for Mr. Lawrence to elevate his legs. R. at 55, 57. Also, Dr. Savage testified that edema is not a significant impairment. R. at 55-56.

Dr. Savage concluded that because of the normal ejection fraction and only trace edema, Mr. Lawrence should be able to easily do light work. R. at 48. Specifically, 6 out of 8 hours could be spent standing and Mr. Lawrence could frequently lift 10 pounds and less frequently lift 20 pounds. R. at 48. Dr. Savage felt that Mr. Lawrence should not climb ladders, ropes or scaffolds or work around unprotected heights; overhead lifting would be limited and only possible on the left side. R. at 48. Dr. Savage also said kneeling and crawling should be avoided without kneepads, but that this is true of most people; stooping should not be an issue. R. at 49.

When re-examined about Mr. Lawrence's heart problems, Dr. Savage explained that Mr. Lawrence's heart problems should have been resolved by the bypass. R. at 60. Dr. Savage pointed out that Mr. Lawrence is classified as having class II heart disease, which should only limit him when engaged in severe activity, causing shortness of breath. R. at 60. Obesity might also be a

cause of the shortness of breath.  R. at 61.  In general, a class II could easily do light work.  R. at 62.

III.  Vocational Expert Testimony

Vocational Expert Pamela Tucker testified as to the job market in Chicago and six surrounding counties.  R. at 50.  She testified that Mr. Lawrence would be classified as a Road Supervisor—a light, semi-skilled worker per the DOT.  R. at 52. But Ms. Tucker did note that as performed, Mr. Lawrence's occasional duties such as lifting 50-pound bags of salt in snow would be classified as medium intensity.  R. at 51.  Ms. Tucker explained that parts of Mr. Lawrence's job would be classified as managerial; she opined that his position was likely 30 percent managerial and 70 percent physical.  R. at 52-53.  Ms. Tucker testified that the job would involve a lot of sitting, climbing onto busses, and only occasional overhead reach.  R. at 53.  It would not involve more than occasional kneeling, crouching or crawling or require climbing ladders, ropes, scaffolds, or work at heights.  R. at 53.  Ms. Tucker felt that the job could be performed sitting, standing, or walking six hours, but the position was mainly sitting.  R. at 53.

Being a higher semi-skilled position, Ms. Tucker testified that an employee could be "off task" for eight to ten percent of the time.  R. at 59.  Because of this limitation, someone who had

to lie down and sleep for 30 minutes to one hour a day would not be qualified to perform the position. R. at 59-60. Ms. Tucker also testified that Mr. Lawrence likely acquired skills from his past that would potentially transfer to sedentary occupations, including Mr. Lawrence's supervisory, customer service, and scheduling skills, ranging from an SVP of 3-6. R. at 63. His position with the CTA was an SVP 6. R. at 63-64. Finally, Ms. Tucker testified that there would be "more than very little" vocational adjustment to a position outside of the transportation industry. R. at 65.

The ALJ closed by saying there would be too many vocational adjustments to find transferrable skills; therefore, if the ALJ deemed Mr. Lawrence sedentary the hearing decision would be in his favor. R. at 66.

IV. Medical Records Before the ALJ

Mr. Lawrence has a history of heart failure, requiring bypass surgery in 2003 with an apparently good result. R. at 237, 231. On February 21, 2007, Mr. Lawrence underwent cardiac testing and was able to achieve a workload of 9.1 METS. R. at 382. His ejection fraction was 67%. R. at 382. Testing did not reveal any indication of ischemia and ventral systolic function was normal. R. at 382.

## A.   2007 Medical History:

On February 22, 2007, a biopsy of the prostate collected showed carcinoma, Gleason's 3+4.  R. at 389-390.  By February 27, 2007, Dr. Latchemsetty determined that Mr. Lawrence had prostatic adenocarcinoma, Gleason's 7.  R. at 392.  He elected treatment with a Da Vinci prostatectomy, and surgery was performed on July 26, 2007.  R. at 424-5.  At the time of surgery, Mr. Lawrence had a Gleason's score of 9, with perineural invasion.  R. at 426.  On a follow-up visit on June 18, 2008 with Dr. Latchemsetty, Mr. Lawrence did well.  R. at 771.  Mr. Lawrence denied any shortness of breath or chest pain at this time.  R. at 771.

Records from St. Francis Health Center consist of a bone scan order by Dr. Asgar due to prostate cancer and metastic disease on July 2, 2007.  R. at 510-11.  Additional testing was warranted, but a venous duplex exam showed no evidence of deep venous thrombosis or venous insufficiency.  R. at 499.  However, Mr. Lawrence was placed on short-term disability from July 22, 2007 to October 8, 2007 due to tendonitis of the left thigh and continued working.  R. at 496-498. He was limited to light work during this period.  R. at 496-498.

Additional cardiac testing was abnormal on December 2007, showing reversible perfusion defects, ischemia in the LAD distribution, ischemia in the RCA overlap Circumflex

distribution, and transient ischemic dilatation post stress, potentially indicating multi-vessel coronary disease.  R. at 388.

B.  2008 Medical History:

In March 2008, Mr. Lawrence complained to Dr. Asgar of tingling and burning in his upper and lower extremities, yet physical exams came back unremarkable.  R. at 288.  Mr. Lawrence denied back or joint pain or any swelling in his extremities, as well as shortness of breath upon exertion.  R. at 534-536. Similarly in January 2008, December 2007, and October 2007, Mr. Lawrence also denied back pain, joint pain, or swelling of the extremities, as well as shortness of breath upon exertion.  R. at 388.

Mr. Lawrence complained of knee pain in January 2007, a year before he stopped working.  But he did not mention knee pain again until April 3, 2008.  R. at 434.  At that visit, Mr. Lawrence was found to have knee pain, tenderness and swelling of both knees, with pain on range of motion testing.  R. at 848-9.

Mr. Lawrence saw his primary care physician again on June 5, 2008, complaining of symptoms in his upper left extremity.  R. at 845-847.  He denied back or joint pain, or any swelling of the extremities.  R. at 845-847.  He was seen on July 11, 2008 with a complaint of low back pain and also complained of joint pain, but

he never mentioned any swelling. R. at 842-844. He weighed 292 pounds. R. at 842-844. The only finding during this exam was pain and tenderness in the lower back with a full range of motion. R. at 842-844.

On April 10, 2008, cardiologist Dr. Henry Shin reported that Mr. Lawrence had congestive heart failure due to ischemic cardiomyopathy. R. at 311. Mr. Lawrence was classified as New York Heart Association class II. R. at 311. His echocardiogram showed normal left ventricular function with an ejection fraction of 65%. R. at 311. There was no significant valvular pathology. It was suspected that some of Mr. Lawrence's dyspnea on exertion was due to body habitus and he was encouraged to diet and walk. R. at 311.

Dr. Shin prescribed compression stockings for Mr. Lawrence on June 26, 2007 due to pain and venous insufficiency and on January 18, 2008 due to edema. R. at 312-313. On April 10, 2008 Mr. Lawrence complained of bilateral knee pain, but a physical examination revealed nothing out of the ordinary. R. at 311. No edema was noted. R. at 311. Mr. Lawrence's congestive heart failure was noted and his injection fraction was 60%. R. at 610. In spite of the knee pain, the x-ray on April 3, 2008 came back unremarkable. R. at 786.

On June 6, 2008, Mr. Lawrence underwent a consultative

medical examination. R. at 758-762. He complained of fatigue and a little chest discomfort with walking two blocks and climbing 10 stairs. R. at 759. He reported that his left leg swelled but his right leg did not. R. at 759. He complained of arthritis in his knees, but he did not claim any swelling. R. at 759. His right big toe swelled on occasion. R. at 759. He weighed 288 pounds at this time and his blood pressure was 110/78. R. at 760. He had trace edema in his left leg. R. at 760. He had limited range of motion in his left shoulder, but both of his knees had full range of motion. R. at 761. He complained of tenderness in his knees and left shoulder. R. at 761.

On June 20, 2008, agency consultant Calixto Aquina, M.D. reviewed the record and concluded that Mr. Lawrence retained the physical residual functional capacity to perform work consistent with the light level of exertion but could climb ladders, ropes and scaffolds only occasionally. In addition, reaching overhead was limited. R. at 870-872.

V. The ALJ's Decision

The ALJ found Mr. Lawrence disabled, but not on the date that Mr. Lawrence alleges the onset of his disability. Specifically, she concluded that he was not disabled prior to September 9, 2008, but became disabled on that date and had

continued to be disabled through the date of her decision.  She determined that Mr. Lawrence met the insured status requirements of the Social Security Act through December 31, 2012, and had not engaged in substantial gainful employment since the alleged onset date of January 1, 2008.  R. at 13.  The ALJ explained that Mr. Lawrence alleged disability due to heart failure, chronic ischemic heart disease, coronary heart disease, triple bypass, hypertension, prostate cancer, prostatectomy, sleep apnea, hyper cholesterolemia, arthritis, tendinitis, gout and acid reflux.  R. at 14-15.  Although the medical expert found no CFR Part 404, Subpart P, Appendix 1 condition (prostate gland carcinoma), Mr. Lawrence's record convinced the ALJ to find this listing-level impairment as of September 9, 2008 under Listing 13.24(A.)  R. at 22.  The ALJ stated that she was giving Mr. Lawrence "the benefit of the doubt" by disagreeing with the expert's opinion that his prostate gland carcinoma did not qualify.  R. at 22.  She found no other disability.  R. at 15.  Based on the testimony of Dr. Savage and Ms. Tucker, as well as Mr. Lawrence's record, the ALJ found no other impairment starting before September 9, 2008.  R. at 21.

## STANDARD OF DISABILITY ADJUDICATION

An individual claiming a need for DBI or SSI must prove that he has a disability under the terms of the SSA.  In determining

whether an individual is eligible for benefits, the social security regulations require a sequential five-step analysis. First, the ALJ must decide if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must evaluate whether the claimant can perform his past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant has the burden of proof. At step five the burden shifts to the Commissioner. *Id*.

## STANDARD OF REVIEW

A district court reviewing an ALJ's decision must affirm the decision if it is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"' rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not, "displace the ALJ's

judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)(citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Suillivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

## **ANALYSIS**

Mr. Lawrence argues that the ALJ's decision should be reversed or remanded because she failed to consider testimony that he could not return to his past relevant work as a road supervisor; erred in stating that Mr. Lawrence could continue to do light work; did not properly consider the requirements of SSR 02-1P regarding Mr. Lawrence's obesity; wrongfully interpreted

the classification of Class II heart failure; failed to consider the combination of Mr. Lawrence's impairments when making her decision to deny benefits; failed to state all of the elements that affect Residual Functional Capacity, and failed to give Mr. Lawrence a fair and full hearing.

To establish disability under the Social Security Act, Plaintiff must show the existence of a medically determinable physical or mental impairment, expected to last at least twelve months or result in death, that rendered him unable to engage in substantial gainful activity. 42 U.S.C. §§ 423(d)(1)(A). If an individual is not working and has a severe impairment that does not meet or medically equal a listing, the adjudicator evaluates the claimant's Residual Functioning Capacity ("RFC"). *See* 20 C.F.R. § 404.1520(a)(4). Thereafter, the adjudicator compares the Claimant's RFC to the requirements of the claimant's past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can perform his past relevant work, a finding of disabled is inappropriate. *Id.*

The ALJ did determine Mr. Lawrence disabled beginning on September 9, 2008. However, the ALJ did not find that Mr. Lawrence met the requirements of Section 13.24 prior to that date. To qualify for disability benefits, one must first be disabled. Mr. Lawrence was given "some benefit of the doubt"

when the ALJ determined he was disabled from the date September 9, 2008 forward.  R. at 22.  Mr. Lawrence asserts that the ALJ acted "nefariously" in failing to consider testimony from the hearing, and that Mr. Lawrence did not receive a full and fair hearing so that the ALJ could deny Mr. Lawrence and his minor child eight months of benefits.  Pl.'s Brief at 9.  The same way that the Court will not question the credibility determination made by the ALJ, the Court will likewise not entertain suggestions that the ALJ acted in bad faith when determining that Mr. Lawrence did not qualify for benefits from the period January 2, 2008 to September 8, 2008.

## 1. THE ALJ'S CONSIDERATION OF MR. LAWRENCE'S ABILITY TO RETURN TO HIS PAST RELEVANT WORK

Mr. Lawrence first argues that the ALJ erred in her evaluation of Step Four of 20 C.F.R. § 404.1520 —determining that Mr. Lawrence could return to his past relevant work as a road supervisor.  Mr. Lawrence claims that the DOT classifies his former position as light, semi-skilled work but as performed it should actually be classified as medium.  Pl.'s Brief at 8.  Mr. Lawrence claims that his job is rarely managerial and almost entirely physical; by wrongly determining that his former position was light work, Mr. Lawrence asserts that the ALJ erred in her rationale that he could return to his former job.  Pl.'s

Brief at 8.  Mr. Lawrence opines that the ALJ's appraisement of his ability to do his past relevant work lacks a "critical view" of the evidence as required by *Lopez v. Barnhart,* and the "evidentiary support" required by *Steele v. Barnhart.*  Moreover, Mr. Lawrence claims that Vocational Expert Ms. Tucker deviated from the *Dictionary of Occupational Titles* (the "DOT") by testifying that Mr. Lawrence could do his past work when he had a problem reaching overhead on his left side.  Pl.'s Brief at 8.

*I. The ALJ's "Critical Review" of Mr. Lawrence's Testimony*

When courts conduct a "critical review" of the evidence before affirming the Commissioner's decision, they must determine whether the decision lacks evidentiary support or an adequate discussion of the issues.  *Lopez v. Barnhart*, 336 F.3d 535, 537 (7th Cir. 2003)(quoting *Clifford v. Apfel*, 227 F.3d. 863, 869 (7th Cir. 2000)(quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

Mr. Lawrence claims that the ALJ failed to comply with SSR 96-7p and SSR 06-04p when she failed to consider the entire case record.  He claims that she inaccurately assessed his credibility and failed to resolve conflicts between evidence.  Specifically, Mr. Lawrence says that the ALJ ignored testimony that his job was very stressful and that he had health problems, including knee

pain.  Pl.'s Brief at 7.  Additionally, he asserts that he ALJ also ignored that he had to be outdoors in the cold, and that he could not reach overhead. Pl.'s Brief at 7.  However, the ALJ considered Mr. Lawrence's testimony regarding his health, and made a fair determination that Mr. Lawrence could perform his past relevant work as a road supervisor based upon other forms of evidence, including expert testimony and the medical records at hand.

First, while Mr. Lawrence may classify his job as stressful because he must listen to and resolve frequent customer complaints, the ALJ did not believe this was grounds for finding Mr. Lawrence disabled.  Rationally, resolving customer complaints does not aggravate the physical impairments Mr. Lawrence says keep him from doing his job based upon the RFC.

Second, the ALJ evaluated both Dr. Savage's expert testimony as well as substantial medical records regarding Mr. Lawrence's knee pain and heart problems.  She determined that none of these issues alone, or in combination, would keep Mr. Lawrence from performing his duties from the period of January 2, 2008 to September 8, 2008.  R. at 19.  Specifically, Dr. Savage found no medical need for Mr. Lawrence to elevate his legs or wear compression stockings.  R. at 55, 57.  During the contested period, Mr. Lawrence did not complain of knee pain to his

physician.  R. at 434 (Mr. Lawrence did not complain of knee pain until April 3, 2008).  Taking this under advisement, the ALJ did not find Mr. Lawrence's knee pain or other ailments grounds for granting disability.  Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts.  *Herr v. Suillivan*, 912 F.2d at 181.

Mr. Lawrence goes on to claim that the ALJ was "disingenuous" in stating that he could do his past relevant work because she did not want to consider options for sedentary work, as she would have to refer to the Medical-Vocational Guidelines. Pl.'s Brief at 8.  But Mr. Lawrence fails to provide any evidence of wrongdoing.  The ALJ stated that if Mr. Lawrence was found capable of only sedentary work, she would find him disabled because it would be too difficult for Mr. Lawrence to transition into a sedentary position.  R. at 66.  Nothing in the hearing, or in the ALJ's opinion, suggests that she was trying to do anything but help Mr. Lawrence receive benefits in a fair fashion.[1]  The fact that she did give Mr. Lawrence "some benefit

---

[1]The Court takes seriously all claims of ALJ bias and misconduct. In view of this serious allegation, a painstaking review of Mr. Lawrence's hearing transcript, medical records, and the ALJ's decision followed. The Court concludes from its review that the accusations made against the ALJ are unwarranted, and inappropriate. Allegations that the ALJ harbored a "nefarious" hidden agenda are baseless. The Court found the ALJ's decision to rule against the advice of the Medical Expert and find Mr. Lawrence disabled, although for a shorter period than he alleged, as nothing short of a commendable use of

of the doubt" and found him disabled against Dr. Savage's recommendation affirm the ALJ's attempt to accommodate Mr. Lawrence. The Court commends the ALJ's thorough analysis of the issues at hand, and her respect for Mr. Lawrence's subjective experience.

Mr. Lawrence also alleges that the ALJ erred because the Vocational Expert erroneously classified Mr. Lawrence's work as that of a road supervisor, which would be 30% managerial and 70% physical. Pl.'s Brief at 7. DOT 913-133-010 Road Supervisor for bus drivers involves giving instructions to bus drivers and observing and recording passengers and working with schedules and customer complaints. While Mr. Lawrence claims this was not the job as he described it, it is similar to his testimony. R. at 40 (Mr. Lawrence worked for the CTA as a supervisor for individuals who did not want to do their job and had to resolve customer and employee complaints). It does not appear that there is anything wrong with the classification the ALJ, or the Vocational Expert, used in explaining Mr. Lawrence's position.

*ii. The Vocational Expert's Testimony Supports that Mr. Lawrence Can Work, even if he has Problems Reaching Overhead on the Left*

---

judicial discretion. The record does not support Mr. Lawrence's allegation that the ALJ set out to deprive Mr. Lawrence and his minor child of the extra benefits to which Mr. Lawrence believes he was entitled.

Next, Mr. Lawrence claims Vocational Expert Ms. Tucker deviated from the DOT by testifying that Mr. Lawrence could do his past work as a road supervisor even though he had a problem reaching overhead on his left side. Pl's Brief at 8. Mr. Lawrence says the DOT description of a road supervisor includes frequent reaching, and that the ALJ did not resolve the conflict between the DOT and Ms. Tucker's testimony under SSR 00-4p. Pl.'s Brief at 8. However, the record shows that the only reaching that Mr. Lawrence could not do was occasional overhead lifting on his left side. R. at 14. This specific type of reaching does not disqualify Mr. Lawrence from performing his previous work. Mr. Lawrence is capable of all other directional reaches, and has a full range of motion to reach overhead with his right side.

In reviewing an ALJ's decision for substantial evidence, the Court may not, "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Rather, where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Suillivan*, 912 F.2d 178, 181 (7th Cir. 1990). The ALJ did consider all

information provided by Mr. Lawrence, but nonetheless determined that he could perform his past relevant work.

## 2. THE ALJ'S CONSIDERATION THAT MR. LAWRENCE COULD CONTINUE TO DO LIGHT WORK

Mr. Lawrence accuses the ALJ of manipulating the exertion necessary for his past work in order to deny him disability benefits. If the ALJ had found Mr. Lawrence only capable of Sedentary work, he would meet the requirements of 20 C.F.R. § 1599 Appendix 2 to Subpart B of Part 404 Table 201.06, and thus be disabled. Pl.'s Brief at 8. Specifically, Mr. Lawrence accuses the ALJ of erring when analyzing his obesity and heart condition in relation to his ability to do light work, and classifying Mr. Lawrence's previous position as exertionally light work, in spite of Mr. Lawrence's testimony to the contrary.

A claimant is not disabled if he can perform his past relevant work, either as he performed it, or as it is generally performed in the national economy. *See Getch v. Astrue*, 539 F.3d 473, 482 (7th Cir. 2008)("[T]he ALJ need not conclude that the claimant is capable of returning to the precise job he used to have; it is enough that the claimant can perform jobs substantially like that one."). The Vocational Expert testified that Mr. Lawrence's job met the listing of "road supervisor," and that the DOT classified this position as exertionally light

work.  R. at 53.  While Mr. Lawrence may have performed his job at the extertionally medium level, in general the Vocational Expert testified that this job did not require an individual to perform at a medium level.  R. at 53.

The ALJ first found that Mr. Lawrence could perform a limited range of light work, and then she compared the RFC to the requirements of Mr. Lawrence's past relevant work.  Based on the RFC comparison to Mr. Lawrence's past relevant work, the ALJ found that Mr. Lawrence could continue to do his job.  R. at 14-21.

Mr. Lawrence claims that, "When the ALJ manipulated the exertion necessary at past work, from how it is actually performed to how the VE views the jobs in the DOT, then she is able to deny disability."  Pl.'s Brief at 9.  But that is not the law. *Getch v. Astrue* informs that, where naturally each job will have some unique qualities, it will nonetheless fall under the umbrella of the Vocational Expert's DOT determination.  539 F.3d at 482.  There is no evidence of manipulation.  The ALJ said that if she found Mr. Lawrence to be capable of only sedentary work, she would find him disabled because "there's too much vocational adjustment to find transferrable skills."  R. at 66.  This would have been favorable to Mr. Lawrence.  However, the ALJ did not think that Mr. Lawrence was only capable of doing sedentary work

based upon Mr. Lawrence's testimony, the record, and the Vocational Expert's testimony. Thus, while Mr. Lawrence claimed he performed his job at the exertionally medium level, given the Vocational Expert's and Mr. Lawrence's testimony, the ALJ reasonably felt that Mr. Lawrence's previous work was exertionally light.

### 3.  THE ALJ'S CONSIDERATION OF SSR-1P ON MR. LAWRENCE'S OBESITY

Next, Mr. Lawrence claims that the ALJ failed to comply with SSR 02-01p in ignoring the impact of the claimant's obesity on his ability to do work.

Mr. Lawrence argues that the ALJ only considered the effect that his weight would have on medium-level work and failed to consider the effects obesity would have on light work. ("…[The ALJ] states obesity is documented and could cause or contribute to symptoms of pain and fatigue. She does not consider pain and fatigue as a limitation at all exertional levels but just at medium activity.") Pl.'s Brief at 10. However, the ALJ did consider the effects of obesity—she determined that the obesity limited Mr. Lawrence to performing only exertionally light work, keeping him from performing extertionally medium work. ["I recognize that obesity is documented… [a]nd have considered this when limiting the claimant to light as opposed to medium work.") R. at 19. Therefore, when the ALJ did not discuss how obesity

would affect Mr. Lawrence's ability to do light work, it was because she felt that it did not interfere with his ability to do light work. The Court finds the ALJ's analysis reasonable and accurate. Substantial evidence supports that the ALJ meant obesity would prevent Mr. Lawrence from performing medium work and instead relegate him to performing light work. R. at 19, ("Dr. Savage in particular gave a very detailed explanation for why the claimant is capable of light exertion").

## 4. THE ALJ'S INTERPRETATION OF CLASS II HEART FAILURE ON MR. LAWRENCE'S RESIDUAL FUNCTIONAL CAPACITY

Mr. Lawrence is in class II heart failure. The American Heart Association defines class II as "slight, mild limitation of activity, [where] the patient is comfortable at rest or with mild exertion" and "ordinary physical activity results in fatigue, palpitation, dyspnea, or anginal pain." Pl.'s Brief at 11.

Mr. Lawrence claims that the ALJ should have reviewed prior medical records showing consistent heart problems since 2003 and built a bridge from the evidence to the conclusion under *Schmidt v. Barnhart*. 395 F.3d 737, 744 (7th Cir. 2005)(ALJ must "build a logical bridge from the evidence to his conclusion," but need not provide a complete written evaluation of every piece of evidence). While the bridge the ALJ built may not be favorable to Mr. Lawrence, the ALJ did indeed build a bridge from the

evidence to her conclusion, denying Mr. Lawrence benefits. She cites that Mr. Lawrence "worked for many years" following his 2003 and 2005 surgeries. R. at 16-19. She considered Dr. Shin's opinion that Mr. Lawrence's shortness of breath was caused by obesity, not a heart condition. R. at 16. The ALJ further discussed his normal 2007 and 2008 cardiac tests and his lack of symptoms through Dr. Shin's September 25, 2008 report. R. at 19. These records included his repeatedly normal ejection fractions and his ability to exercise to 9 METS. R. at 19. The ALJ also reviewed and discussed Dr. Savage's testimony that a Class II heart impairment only caused shortness of breath on severe exertion, whereas Class III heart impairment caused shortness of breath on light exertion, so it appeared that Dr. Shin, Mr. Lawrence's cardiologist, was right to suggest that Mr. Lawrence's shortness of breath was the byproduct of obesity rather than a heart impairment. R. at 61, 17, 259.

Between the class II definition as well as her independent examination of Mr. Lawrence's prior medical records, the ALJ built a logical bridge from the information provided to the conclusion that Mr. Lawrence was capable of working under *Schmidt v. Barnhart*.

## 5. THE ALJ'S REVIEW OF MR. LAWRENCE'S IMPAIRMENTS IN COMBINATION WITH EACH OTHER

Mr. Lawrence claims that the ALJ did not consider his obesity in combination with his heart condition in such a way that would keep him from pursuing light work. Mr. Lawrence also claims that the heart condition involved problems such as coronary artery disease, hypertension, and status post stents. Additionally, Mr. Lawrence has sleep apnea and arthritis pain, and claims that the ALJ ignored these conditions in combination with the above-reference conditions. Because of all of the above, Mr. Lawrence alleges that the ALJ failed to comply with SSR 96-7p. Pl.'s Brief at 8.

To the contrary, the ALJ's detailed decision considered all of these ailments and found them to limit Mr. Lawrence to light work. R. at 14-21, ("[o]verall considering these impairments in combination, I agree that a limitation to light exertion is appropriate." R. at 19. Mr. Lawrence does not point to anything that the ALJ specifically failed to consider when evaluating the credibility of his subjective complaints. The ALJ provided sufficient evidence that she indeed reviewed Mr. Lawrence's testimony, medical records, daily activities, work history, and physician opinions:

"...[w]hile the claimant complains infrequently of musculoskeletal pains primarily in the back and knees, the examinations have been unremarkable and significantly the x-ray of the knees is normal. While the claimant reports he has gout, Dr. Savage noted that doctors are not following uric acid levels which would be expected in gout. I recognize that obesity is documented and could cause or contribute to some of his symptoms, including pain and fatigue. Pursuant to the evaluation suggested in SSR 02-1p I have considered this when limiting the claimant to light as opposed to medium level exertion."

R. at 19. There is no question that the ALJ considered these ailments in combination with each other, but nonetheless felt Mr. Lawrence capable of light exertion.

6. WHETHER THE ALJ FAILED TO STATE ALL OF THE ELEMENTS THAT
   AFFECT MR. LAWRENCE'S RESIDUAL FUNCTIONAL CAPACITY

Mr. Lawrence opines that the ALJ "must have assumed that she did not have to consider [Mr. Lawrence's] RFC once she stated he could do his past relevant work." (Pl.'s Brief at 12). However, the RFC is evaluated before the ALJ assesses whether the claimant can perform his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4). Mr. Lawrence first says the Medical Expert

misunderstood his need to elevate his legs due to vein harvesting
rather than veinous insufficiency. R. 55. Mr. Lawrence also
cites his fatigue while walking, obesity, and problem reaching
overhead and to the left as reasons why the ALJ did not build a
logical bridge as required by *Prochaska*. *Prochaska* requires that
the ALJ must consider an entire case record in assessing
credibility when a plaintiff states that he cannot do his job.
454 F.3d. 731, 738 (7th Cir. 2006). The ALJ did consider all of
these elements when evaluating Mr. Lawrence's RFC, and before she
determined that he could do his past relevant work.

The ALJ first evaluated Mr. Lawrence's RFC. She then found
that Mr. Lawrence's past relevant work did not require the
performance of activities that exceeded his capacities based upon
his RFC. R. at 21. The ALJ heard Ms. Tucker's testimony that as
performed in the national economy, a road supervisor did not need
to climb ladders, ropes or scaffolds, work at unprotected
heights, or engage in more than occasional overhead reaching with
the left arm. R. at 53. Basically, all of the activities that
Mr. Lawrence could not perform with his RFC would not be required
of a road supervisor. Even though Mr. Lawrence says that a
conflict arises under SSR 00-4p when Ms. Tucker fails to consider
the DOT's requirement of frequent reaching, as previously
discussed, the limitation was only against "overhead" reaching

and not reaching in general.  R. at 14.  The ALJ's decision in the context of Mr. Lawrence's RFC is reasonable.

## 7. MR. LAWRENCE'S CLAIM THAT HE DID NOT RECEIVE A FULL AND FAIR HEARING

Finally, Mr. Lawrence claims that, because the ALJ talked to the Medical Expert prior to the hearing, he was denied a full and fair hearing.  Mr. Lawrence also asserts that the ALJ did not determine when he became disabled under a Residual Functional Capacity Assessment, but rather concentrated on the Listing so that "he and his minor child lost eight months of benefits."

The ALJ informed Mr. Lawrence that she had spoken with Dr. Savage before the hearing and summarized what they said.  They discussed only whether Mr. Lawrence met Listing 13.24.  R. at 32, 45.  That said, at the hearing the ALJ thoroughly examined Dr. Savage and asked if there was any possibly way that Mr. Lawrence could be found to meet or equal the Listings.  R. at 32-45; 46-47.  Mr. Lawrence's attorney also cross-examined Dr. Savage during the hearing.  The pre-hearing conversation did not deprive Mr. Lawrence of a full and fair hearing.

As to the charges that the ALJ ignored the Residual Functional Capacity Assessment and instead focused on the Listing to find Mr. Lawrence not disabled, Mr. Lawrence misunderstands

the process by which disability determinations are made. The listings are considered at Step Three of the sequential five-step evaluation. *See* 20 C.F.R. § 404.1520(a)(4)(iii). The Residual Functional Capacity Assessment is evaluated after an ALJ determines whether the claimant's impairments equal a listing. *See* 20 C.F.R. §§ 404.1520(a)(4), 404.1520(a)(4)(iii)-(iv). So, first questioning Dr. Savage about the Listing before discussing the Residual Functional Capacity Assessment is the proper application of the law. Therefore, the ALJ did not deprive Mr. Lawrence of a full and fair hearing either by speaking with the Medical Expert prior to the hearing, or by examining the Medical Expert about the Listing before asking about the Residual Functional Capacity Assessment.

## **CONCLUSION**

For the reasons set forth above, Claimant's motion for summary judgment [#21] is denied, and the Commissioner's motion for summary judgment [#26] is granted. The decision of the ALJ is affirmed.

Dated: August 16, 2012          ENTER:

*Arlander Keys*
_____

ARLANDER KEYS
United States Magistrate Judge